UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRESIDIO WEALTH MANAGEMENT, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COLUMBIA CASUALTY COMPANY,<br><br>Defendant. | Case No. 13-cv-04604-WHO<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 24 |

## INTRODUCTION

Plaintiffs Presidio Wealth Management, LLC, Presidio Capital Advisors, LLC and Presidio Financial Partners, LLC (collectively "Presidio") provide wealth management and investment services. During the economic downturn in 2009, clients of Presidio, the Tsurus, demanded that Presidio return their funds because they needed their money and the investment Presidio had made for them was illiquid. Presidio worked with the clients to find an accommodation and did not tender a claim to its insurer. Eventually, the clients filed suit and Presidio sought insurance coverage from its carrier, defendant Columbia Casualty Company. The question I must answer in the parties' cross-motions for summary judgment is whether the clients' initial demands constituted a claim as that term is defined by the insurance policy issued by Columbia to Presidio. It does, and since the claim was made before Columbia covered Presidio, Columbia had no duty to cover Presidio when the lawsuit was finally filed. Accordingly, I GRANT Columbia's motion for summary judgment and DENY Presidio's cross-motion for summary judgment.

**BACKGROUND**

Presidio purchased a "claims made"[1] Investment Management Liability Solutions Insurance Policy from Columbia which provided coverage for claims first made against Presidio during the policy period of July 1, 2010 to July 1, 2011. Presidio tendered an arbitration claim and civil action filed against it by Frank and Stephanie Tsuru in October and November 2010, respectively, to Columbia for coverage. On April 8, 2011 Columbia denied coverage on the basis that the claims first arose prior to the policy period, in October 2009 and January 2010, when Mr. Tsuru emailed Presidio about the same circumstances at issue in the subsequent claims. Following Columbia's denial of coverage, Presidio filed suit against Columbia alleging breach of contract and breach of the covenant of good faith and fair dealing and for declaratory relief.

Columbia argues that Mr. Tsuru's October 2009 and January 2010 emails to Presidio constitute claims, that those claims are interrelated to the claims later tendered to Columbia, and that the later claims therefore first arose before the policy period, precluding coverage. Dkt. No. 23. In contrast, Presidio argues that Mr. Tsuru's emails do not constitute claims and therefore the litigations do not present claims that were first made prior to the policy period. Dkt. No. 24. Presidio also argues that the later claims are not related to the claims raised in the emails because the concerns Mr. Tsuru raised in the emails were resolved before the civil action and arbitration were filed.

---

[1] "A 'claims made' policy is one whereby the carrier agrees to assume liability for any errors, including those made prior to the inception of the policy, as long as a claim is made during the policy period." *Homestead Ins. Co. v. Am. Empire Surplus Lines Ins. Co*., 44 Cal. App. 4th 1297, 1303 (1996) (internal punctuation and citation omitted). In contrast, an "occurrence" policy provides coverage for any acts or omissions that arise during the policy period, even if the claim is made after the policy has expired. *Id*. Claims made policies were developed by insurance companies "to reduce exposure to an unpredictable and lengthy 'tail' of lawsuits brought long after an occurrence policy period." *Id*. at 1304. By limiting an insurer's risk, claims made policies "permit insurers to predict more accurately both the limits of their exposure and the premium needed to accommodate the risk undertaken." *Id*. (citation omitted). As a result, "claims made" policies "benefit insureds by making coverage cheaper and more widely available." *Id*. (citation omitted).

## I. THE TSURUS' DEALINGS WITH PRESIDIO

Frank and Stephanie Tsuru hired Presidio in 2007 to manage certain investments. Cobb Decl. ¶ 5. The Tsurus assert that they deposited around $10 million into a custodial account managed by Presidio. *See Frank D. Tsuru and Stephanie K. Tsuru v. Presidio Financial Partners, LLC and Presidio Wealth Management, LLC*, Case No. 10-cv-2321 (N.D. Tex. November 15, 2010) (the Tsurus' complaint against Presidio) ¶ 11 [Dkt. No. 23-3].[2] The Tsurus allege that Presidio, without the Tsurus' knowledge, used the Tsurus' money to buy Auction Rate Preferred Securities ("ARPS"). *Id*. The Tsurus assert that the investment in ARPS was illiquid, preventing the Tsurus from purchasing property and otherwise accessing their funds when they wished. *Id*.

Between September 2009 and January 2010, Frank Tsuru emailed Presidio several times complaining about the ARPS investment, asking that Presidio solve the illiquidity situation, and that he be "made whole."[3] In an email dated October 15, 2009, Mr. Tsuru wrote:

> I honestly feel that Presidio got me into this mess and they must get me out. You have managed to get ever [sic] other Presidio customer out of these ARPS except for me. I have heard all the reasons why you invested the money in these securities; that you did not know of the pending illiquidity and for many years the auctions were always successful. You guys are the pros and it is your job to test the current environment and know what is out in front….
>
> It will soon be two years that my life savings has been in an illiquid situation and that is totally unacceptable. I have missed a huge opportunity in the market costing me millions of dollars. I am paying hundreds of thousands of dollars per year on interest payments for my mortgage that I would not have had to take out if my funds were available. And most disturbing, the stress is immense. I do not know if you can imagine having your entire life savings in something that you can not [sic] get to and is paying below market returns. I can no longer sit by the sidelines. Presidio must make me whole by buying me out, forcing redemption of the ARPS or deliver on an acceptable sale. I have been patient as long as I can but I really feel that the music must stop.

---

[2] For purposes of this motion, I assume the truth of the Tsurus' allegations in their lawsuit against Presidio pending in the Northern District of Texas. The merits of their claims are not before me.

[3] Presidio asserts that "the Tsurus were not alone: in 2009, Presidio had approximately 150 clients, the vast majority of whom inquired and/or complained to Presidio about the state of their investments." Opp. at 3 (citing Cobb Decl. at 3, ¶ 10). But whether Presidio's other customers made similar complaints to Presidio, none of which is in the record, has no bearing on the issues before me.

3

> Please let me know how and when I can expect liquidity.

Margulis Decl. Ex. E.

The next day, October 16, 2009, Mr. Tsuru wrote a further email:

> We have talked many times but I have not seen any results. I was getting updates regularly from Colin but that has ceased too. I am at the point now that I must demand for you to make me whole. The conversation we have next must be to let me know how and when you make me whole. . . . As I said in my last email you guys put me into these securities and it is your responsibility to get me out.

Margulis Decl. Ex. F.

Mr. Tsuru wrote a further email on January 20, 2010:

> I am against at the end of my rope and that I need Presidio to make me whole on my investment. The research that I did do on the ARPS tells me why I have not been redeemed versus other individuals that purchased directly from JPM, Merrill, etc. They feel that you, the intermediary, are professional investment firms and are fully versed in the risks and problems associated with the ARPS. Individual investors (like me) that purchased directly from them are not professional investment firms and therefore were redeemed. Presidio should have understood the risks and potential illiquidity that actually came to fruition. Therefore I ask that Presidio redeem me and do what is right. Investors put their trust in your firm because they need the professional assistance. My whole life savings was [sic] put into your hands because you insured [sic] me of your capabilities and knowledge of investing.

Margulis Decl. Ex. G.

Brodie Cobb, Presidio's CEO from 1998 until 2013 and its current Executive Chairman, states that on January 20, 2010, he asked Mr. Tsuru whether he planned to sue Presidio, and Mr. Tsuru responded "I'm not trying to sue you." Cobb Decl. ¶¶ 3, 14, Ex. 13. According to Mr. Cobb, "[s]hortly afterward, Mr. Tsuru told me: 'No harm, no foul. I will be back to do more business with you guys.'" Cobb Decl. ¶ 14.

On February 12, 2010, Mr. Cobb emailed his colleague, Colin Carter, and Mr. Tsuru, stating:

> Frank [Mr. Tsuru] has come up with solution that seems pretty good with UBS in Houston. Plz expect somebody from UBS to contact you to move his ARS to UBS. Plz assist in making this transition as effortless and smooth as possible and help in any way we can.
>
> Frank, if there is anything else I missed, plz let Colin and Lisa know directly. If you, Colin, have any questions just contact Frank directly.

4

> I appreciated your call today, Frank, and am pleased with the solution for you. Have a great weekend.

Cobb Decl. Ex. 14. The Tsurus moved their investments from Presidio to UBS in February 2010. Cobb Decl. ¶ 16.

On October 6, 2010, the Tsurus filed an arbitration claim against Presidio with the Financial Industry Regulatory Authority. Dkt. No. 23-4. Then, on November 15, 2010, the Tsurus filed a civil action against Presidio in the Northern District of Texas.[4] Dkt. No. 23-3. In both the arbitration and civil action the Tsurus allege that they deposited $10 million into a custodial account managed by Presidio that was to be invested in liquid, short term investments pending a more formal longer-term investment plan and that Presidio invested all of the Tsurus' funds into ARPS without the Tsurus' knowledge. The Tsurus allege that the ARPS were "illiquid" and "reckless" investments, and that the risks of ARPS were known to Presidio, but not to the Tsurus. The Tsurus seek to recover their funds and interest and other alleged damages sustained as a result of Presidio investing the Tsurus' funds in the ARPS.

Presidio tendered the civil action and the arbitration claim to Columbia for defense costs and indemnity. Columbia denied coverage on April 8, 2011 on the grounds that the claims were first made between September 2009 and January 2010 when Mr. Tsuru emailed Presidio and demanded to be "made whole." Cobb Decl. ¶ 21, Ex. 19. Since the policy period did not commence until July 1, 2010, Columbia deemed the claims to have been first made prior to the policy period, and therefore not insurable under the policy. Columbia's letter to Presidio explaining its denial of coverage stated:

> The Tsuru Emails referenced above[5] are written demands for monetary damages or non-monetary relief made against the Insured for a Wrongful Act. They demand Presidio make Mr. Tsuru whole, including by buying him out. They allege a Wrongful Act in the rendering or failing to render Professional Services, including Presidio's alleged decision to invest in the Auction Rate Preferred Securities ("ARPS") and Presidio allegedly not understanding the

---

[4] *Frank D. Tsuru and Stephanie K. Tsuru v. Presidio Financial Partners, LLC and Presidio Wealth Management, LLC*, Case No. Case No. 10-cv-2321 (N.D. Tex. November 15, 2010) (complaint).

[5] The same emails referenced above in this opinion.

> risks and potential illiquidity. As such, each of the Tsuru Emails are a Claim.
>
> However, in order to be covered by the Policy, the Insuring Clause requires the Claim to be first made during the Policy Period from July 1, 2010 to July 1, 2011. These Claims were first made prior to the Policy Period incepting on July 1, 2010 and therefore the Tsuru Emails do not trigger coverage under the Insuring Clause.

Cobb Decl. Ex. 19.

Following Columbia's denial of coverage, Presidio filed suit against Columbia alleging breach of contract and breach of the covenant of good faith and fair dealing and for declaratory relief. Dkt. No. 1.

## II. PRESIDIO'S 'CLAIMS-MADE' POLICY ISSUED BY COLUMBIA

The following provisions and definitions in the policy issued by Columbia to Presidio are central to the motions before me. The policy provides that

> [Columbia] shall pay on behalf of [Presidio] that Loss resulting from any Claim first made against [Presidio] during the Policy Period or Extended Reporting Period, if applicable, for a Wrongful Act.

Margulis Decl. Ex. A ("Policy") at CCC 0815 [Dkt. No. 23-2].

The policy states that:

> **THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD**

Policy at CC 0800, CC 0803 (bold and capitalized in original).

The Policy defines the term Claim, in relevant part, as:

> 1. a written demand for monetary damages or non-monetary relief;
> 2. a civil proceeding in a court of law or equity or an arbitration; or
> 3. a criminal proceeding.

Policy at CC 0803.

The Policy provides that:

> [A] Claim shall be deemed made:
>
> a. in the case of a written demand for monetary damages or non-monetary relief, on the Insured's or Insurer's receipt of notice of such demand;
>
> b. in the case of a civil proceeding in a court of law or equity or arbitration, the date of service upon or other receipt by any Insured of a complaint against the Insured

United States District Court
Northern District of California

>in such proceeding or arbitration;

Policy at CC 0808.

>The Policy provides that:
>
>>More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be considered as one Claim which shall be deemed to have been first made on the earlier of:
>>
>>a. the date on which the earliest such Claim was first made, or
>>
>>b. the first date valid notice was given by the Insureds to the Insurer under this Policy of any Wrongful Act or under any prior policy of any Wrongful Act or any fact, circumstance, situation, event or transaction which underlies any such Claim.
>
>Interrelated Wrongful Acts are defined as:
>
>>[A]ny Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event.

Policy at CCC 0808.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

7

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

The present motions require me to answer two questions: (i) do Mr. Tsuru's emails constitute claims as defined in the policy, i.e., "a written demand for monetary damages or non-monetary relief?" and (ii) if so, are Mr. Tsuru's emails and the subsequent civil action and arbitration claim Interrelated Wrongful Acts, as defined, i.e., "logically or causally connected by reason of any common fact, circumstance, situation, transaction or event?" For the reasons stated below, I answer both questions in the affirmative.

Columbia contends that Mr. Tsuru's three emails from October 2009 and January 2010 each constitute "a written demand for monetary damages or non-monetary relief" and, therefore, a claim as defined in the policy. Presidio argues that the emails do not constitute claims because (i) they did not put Presidio on notice that the Tsurus intended to file an arbitration claim or civil action against Presidio; and (ii) they were mere customer complaints and requests for corrective action and did not claim that Presidio "was legally liable for the situation," did not seek damages, and "are not asking that Presidio pay [the Tsurus] a sum of money."

As Columbia rightly notes, there is no requirement that Presidio be on notice that the Tsurus intended to file a lawsuit in order for the emails to constitute claims, as defined in the policy. Presidio's notice argument therefore fails. Whether the substance of Mr. Tsuru's emails constitutes "claims," as defined in the policy, requires more analysis.

**I.  MR. TSURU'S EMAILS ARE CLAIMS**

   **A.  Analysis of the contract language**

The same rules of interpretation applicable to other contracts apply to insurance policies.

8

*Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1391 (2008). "The mutual intention of the contracting parties at the time the contract was formed governs." *Id*. (citing Cal. Civ. Code § 1636). The intent of the parties is ascertained solely from the writing, if possible. Cal. Civ. Code § 1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. The words in a contract are given their ordinary and popular meaning, unless the words are used in a technical sense or a special meaning is given to them by usage. Cal. Civ. Code § 1644. If the language of the contract is clear and explicit, the language governs its interpretation so long as it "does not involve an absurdity." Cal. Civ. Code § 1638.

The insurance policy defines a claim as "a written demand for monetary damages or non-monetary relief."[6] The policy does not define the terms within the definition of "claim"—"demand," "damages," or "relief." Because the parties dispute whether the Tsurus' emails constitute a demand for damages or non-monetary relief, the language of the policy itself does not resolve this dispute.

**B. Pertinent case law**

In order to determine whether the Tsurus' emails constituted "claims" under Columbia's policy, two cases are instructive. In *Westrec Marina Mgmt.*, 163 Cal. App. 4th at 1393, the court found that a letter sent to Westrec from the attorney of one of its employees, Bette Clark, constituted a "claim" within the policy.[7] The letter stated that the attorney represented Clark and that Clark "was subjected [to] constant discriminatory and demeaning treatment by male supervisors based upon her sex." *Id*. at 1390. The letter described alleged incidents of discrimination and wrongful termination. It further stated:

> As you are no doubt aware, Bette has received Right to Sue letters from the DFEH [Department of Fair Employment and Housing]. I

---

[6] There is no argument that the emails constitute a claim under the second and third prongs of the definition of claim: a civil proceeding in a court of law or equity or an arbitration; or a criminal proceeding.

[7] The policy at issue in *Westrec* defined a "claim" to include, "a written demand for civil damages or other relief commenced by the Insured's receipt of such demand."

9

> am writing to you to see if Westrec would prefer to attempt to resolve or mediate this matter, or if it will be necessary to file a lawsuit and have a jury decide the outcome. It is often in an employer's best interests to resolve discrimination claims promptly in order to avoid paying statutory attorney's fees which must be awarded by the court should the employee prevail. Those fees alone can exceed $200,000 by the time of trial.
>
> (…)
>
> Before any litigation becomes necessary, however, I believe the Company should first be permitted to do the right thing to promptly rectify the harm caused to Bette in a confidential and discreet manner. If this matter were to be resolved in this manner, there is a second advantage to the Company—one can almost be assured that a prompt resolution will be far less expensive and less time consuming for the Company and its executives.

*Id.* at 1390.

The court rejected the insured's argument that the letter did not constitute a claim. It explained that "[t]he ordinary meaning of a 'demand' as used in this context is a request for something under an assertion of right or an insistence on some course of action." *Westrec Marina Mgmt.*, 163 Cal. App. 4th at 1392 (citing Webster's 3d New Internat. Dict. (2002) p. 598). The court also stated that "[a] mere request for an explanation, expression of dissatisfaction, or lodging of a grievance that falls short of such an insistence is not a demand." *Id.* Then, explaining how the law applied to the facts, the court held:

> We construe the letter as a settlement demand seeking monetary compensation for the alleged wrongdoing. Although the letter did not expressly demand payment or refer to any specific amount, its meaning was clear that, absent some form of negotiated compensation, Clark would commence a lawsuit against Westrec. The attorney's request for compensation while threatening litigation was a "demand," as that word is ordinarily understood.

In *Phoenix Ins. Co. v. Sukut Constr. Co.*, 136 Cal. App. 3d 673, 677-78 (Ct. App. 1982), the court found that a request by an attorney's client that the attorney work, without payment, to cure problems created by an inadequate mechanics lien's prepared by the attorney constituted a claim.[8] The court explained that "[t]his was not a request for an explanation . . . .[F]urther actions, not explanations were sought by the client. Nor was it a request for new services; it was a demand

---

[8] The policy in *Phoenix* did not define a "claim." In the absence of a contractual definition, the court defined a claim as "a demand for something as a right, or as due."

that [the attorney] correct and complete work for which payment had already been made." *Id*.

Turning to this case, Mr. Tsuru's emails were each a "demand" as that word is used in the definition of "claim." On October 15, 2009, Mr. Tsuru demanded that "Presidio must make me whole by buying me out, forcing redemption of the ARPS or deliver on an acceptable sale." He also stated "Please let me know how and when I can expect liquidity." The following day, Mr. Tsuru stated "I am at the point now that I must demand for you to make me whole. The conversation we have next must be to let me know how and when you make me whole. . . . As I said in my last email you guys put me into these securities and it is your responsibility to get me out." Similarly, Mr. Tsuru's January 20, 2010, email stated, "I need Presidio to make me whole on my investment" and "I ask that Presidio redeem me and do what is right." These emails were not mere requests for explanations; they were both "request[s] for something under an assertion of right" and "an insistence on some course of action" and are therefore demands. *Westrec Marina Mgmt.*, 163 Cal. App. 4th at 1392.

The next question is whether Mr. Tsuru's emails constituted demands *for damages or other non-monetary relief*. Presidio argues that they do not because Mr. Tsuru "never demanded money as damages from Presidio." Presidio Cross-motion at 6-7; *see also* Presidio Reply at 5 ("Nowhere in those communications, however, do the Tsurus make a demand for money as a result of a perceived liability."). Presidio does not directly address the "non-monetary relief" portion of the definition of "claim." Conversely, Columbia argues that "the emails clearly and unequivocally make demands on Presidio for money or other relief." Columbia Opposition at 8. Columbia argues that the October 15, 2009 email was "a demand for monetary damages (repaying the money they lost) or nonmonetary relief (redeeming the securities)." *Id*. at 10. Columbia likewise argues that the October 16 email "was a written demand for monetary damages or non-monetary relief—either money was sought, or something other than money was sought. Either way, it was a Claim." *Id*. at 10-11.

Neither party cites any case law that discusses whether an investor's demand that he be made whole constitutes a demand for damages or other non-monetary relief. *Phoenix* is instructive, even though the policy at issue there did not define a claim. The court defined a claim

11

1   as "a demand for something as a right, or as due" and found that a claim was made against the
2   insured attorney when the attorney's client asked the attorney "to work for free to cure the
3   problems created by the mechanics lien's inadequacies." 136 Cal. App. 3d at 677.
4       There is no meaningful distinction between "a demand *for something as a right, or as*
5   *due*," as used in *Phoenix*, and a "demand *for . . . non-monetary relief*," as used in the definition of
6   claim in the policy agreement at issue here and under the facts in this case. There is little question
7   that Mr. Tsuru's demand was "as a right, or as due." He stated that Presidio "must get me out";
8   that "it is [Presidio's] responsibility to get me out"; and he demanded that Presidio "do what is
9   right." Ultimately, Mr. Tsuru wanted liquidity. He gave three possible ways to achieve that
10  liquidity: "Presidio must make me whole by buying me out, forcing redemption of the ARPS or
11  deliver on an acceptable sale." These are demands for non-monetary relief.[9] Like the insured's
12  client in *Phoenix*, Mr. Tsuru insisted that Presidio "cure the problems" created by Presidio's
13  wrongful conduct, purportedly placing all of the Tsurus' funds in ARPS without understanding the
14  risks associated with the ARPS investment.[10] Consistent with *Phoenix*, Mr. Tsuru's demands that
15  Presidio cure the problems it created constituted a demand for "non-monetary relief."
16      Presidio suggests that Mr. Tsuru's emails did not constitute demands for monetary
17  damages because Mr. Tsuru did not explicitly demand anything beyond access to his own money.
18  I do not agree, but it makes no difference since Mr. Tsuru's emails certainly constituted demands

---

[9] "Buying me out" arguably constituted a "demand for monetary damages" since it would involve money transferred directly from Presidio to Mr. Tsuru. To the extent that it did not constitute a demand for monetary damages, it constituted a demand for non-monetary relief.

[10] Mr. Tsuru stated in his January 20, 2010 email that "Presidio should have understood the risks and potential illiquidity that actually came to fruition." Likewise, Mr. Tsuru stated in the October 2009 emails that "Presidio got me into this mess" and "you guys put me into these securities."

for non-monetary relief.[11]

At oral argument, counsel for Presidio argued that Presidio's "reasonable expectation" was that Mr. Tsuru's emails were not demands because of the "nuance in tone" of Mr. Tsuru's communications with Mr. Cobb, including in phone conversations between Mr. Tsuru and Mr. Cobb, and because Mr. Tsuru and Mr. Cobb were "business friends." Counsel misunderstands the significance of reasonable expectations in contract interpretation. It is correct that "[u]nder the statutory rules of contract interpretation, any ambiguity in the policy terms will be construed against the insurer to protect the insured's reasonable expectation of coverage." *Ameron Int'l Corp. v. Ins. Co. of State of Pennsylvania*, 50 Cal. 4th 1370, 1386 (2010). But "reasonable expectation" refers to expectations of the meaning of the policy at the time of contracting; not the insured's expectation of what the insured's clients' conduct means. *See, e.g.,* Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties *as it existed at the time of contracting*, so far as the same is ascertainable and lawful.") (emphasis added). Counsel's argument relates to Presidio's supposedly "reasonable" interpretation of Mr. Tsuru's emails, not to the interpretation of "claim," as defined in the insurance policy. An insured cannot avoid unambiguous provisions of an insurance policy based on its allegedly "reasonable" interpretations of its clients' "nuanced" communications.

## II. THE EMAILS AND THE SUBSEQUENT CIVIL ACTION AND ARBITRATION ARE INTERRELATED WRONGFUL ACTS

The policy defines "interrelated wrongful acts" as wrongful acts "which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event." Policy at CCC 0808. Columbia argues that the emails and the subsequent civil action and

---

[11] In *Westrec Marina Mgmt*, 163 Cal. App. 4th at 1393, the court found that the letter to the insured was a claim—defined in the policy as "a written demand for civil damages or other relief—even though the letter "did not expressly demand payment or refer to any specific amount." Mr. Tsuru's October 15, 2009 email stated "I am paying hundreds of thousands of dollars per year on interest payments for my mortgage that I would not have had to take out if my funds were available. . . . Presidio must make me whole by buying me out, forcing redemption of the ARPS or deliver on an acceptable sale." That would appear to be a demand for monetary damages.

arbitration claim filed by the Tsurus "arise out of and involve the same 'facts, circumstances, situations, transactions or events,' namely Presidio's investment of Tsuru's funds in the ARPS, which were allegedly unsuitable and dangerous investments, thereby creating an inability to access those funds and damages suffered as a result of that conduct." Columbia motion at 12-13.

Presidio does not argue that the civil action and arbitration claim are not "causally connected by reason of any common fact, circumstance, situation, transaction or event" to the claims raised in the earlier emails. Rather, Presidio argues that the civil action and arbitration claim do not "relate back" to the emails because "subsequent to those emails, Tsuru made it clear he was not seeking to pursue a legal claim and was just expressing frustration at the difficulties in finding a 'solution.' And the 'solution' was found in February of 2010, after which Mr. Tsuru made no further complaints." Presidio cross-motion at 7; Presidio opposition at 6. Presidio further argues that "[t]he heart of the matter is objective: what Mr. Tsuru said and did during and after the three emails, and Columbia cites no reason (or authority) for ignoring those undisputed communications and conduct." Presidio reply at 1.

Columbia's argument that the emails and the subsequent civil action and arbitration claim are "interrelated wrongful acts" is consistent with the plain language of the policy agreement. Presidio's counterargument that events subsequent to when a claim is first made can prevent "relation back"—and break the interrelatedness of otherwise interrelated claims—is inconsistent with the plain language of the policy agreement. While Presidio faults Columbia for not citing authority "for ignoring those undisputed communications and conduct," it is Presidio's lack of supporting authority that is more troubling given that it is Presidio, not Columbia, which seeks to limit the scope of "interrelated wrongful acts" in a manner inconsistent with the language of the policy. Presidio concedes that Mr. Tsuru's emails and the Tsurus' subsequent civil action and arbitration against Presidio arise out of and involve the same facts and circumstances. Nothing about Mr. Tsuru's communications with Presidio after his emails render the subsequent civil action and arbitration claim *not* logically or causally connected to the earlier emails. The claims first made in the emails and the claims subsequently raised in the civil action and arbitration claim are interrelated wrongful acts as defined in the policy. As a result, the Tsurus' claims were first

14

1   made in the policy period prior to the time Columbia insured Presidio and it has no liability to

2   Presidio for those claims.

### III. PRESIDIO'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW

Because I conclude that Presidio does not have coverage for the civil action and arbitration claim under the policy, Presidio's cause of action for breach of the implied covenant of good faith and fair dealing must be dismissed because Columbia did not unreasonably withhold coverage. *See, e.g., Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (Ct. App. 1990) ("there are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause").

### CONCLUSION

For the reasons stated above, Columbia's motion for summary judgment is GRANTED. Presidio's cross-motion for summary judgment is DENIED.  Judgment shall be entered accordingly.

**IT IS SO ORDERED**.

Dated: April 3, 2014



WILLIAM H. ORRICK
United States District Judge